LAILA RAIS, #311731
lrais@marshackhays.com
SARAH R. HASSELBERGER, #340640
shasselberger@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Chapter 7 Trustee,
LARRY D. SIMONS

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

|  |  |
|---|---|
| In re | Case No. 6:25-bk-12353-SY |
| DAVID ROBERT STONE, | Adv. No. _____ |
| Debtor. | Chapter 7 |
|  | COMPLAINT TO DENY DISCHARGE [11 U.S.C. §§ 727(a)(2)(A), 727(a)(3), 727(a)(4)(A), 727(a)(5)] |
| LARRY D. SIMONS, Chapter 7 Trustee, | |
| Plaintiff, | |
| v. | |
| DAVID ROBERT STONE, | |
| Defendant. | |

LARRY D. SIMONS, in his capacity as Chapter 7 Trustee ("Trustee" or "Plaintiff") of the Bankruptcy Estate ("Estate") of David Robert Stone ("Debtor" or "Defendant"), files this Complaint to Deny Discharge ("Complaint") against Debtor and alleges as follows:

## Parties

1.     Debtor, David Robert Stone, is the Chapter 7 Debtor in Bankruptcy Case No. 6:25-bk-12353-SY ("Bankruptcy Case").

2.     Larry D. Simons is the duly-appointed and acting Chapter 7 Trustee of the Estate.

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

## Statement of Jurisdiction and Venue

3.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the Estate) and 28 U.S.C. § 157(b)(2)(J) (objections to discharges). To the extent any claim for relief in this Complaint is determined to be a Stern-claim or not to be a core proceeding, Plaintiff consents to entry of final judgment and orders by the Bankruptcy Court.

4.      Plaintiff has standing to bring this action pursuant to 11 U.S.C. § 323.

5.      This Court has jurisdiction over the above-captioned adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 in that this civil proceeding arises in, arises under, and relates to the Bankruptcy Case pending in the United States Bankruptcy Court for the Central District of California, Riverside Division, entitled *In re David Robert Stone*, and administered under assigned Case No. 6:25-bk-12353-SY.

6.      Venue properly lies in the Central District of California in that this adversary proceeding arises in or is related to a case under Title 11 of the United States Code as provided in 28 U.S.C. §§ 1408 and 1409.

7.      This Court has personal jurisdiction over Debtor, who filed a voluntary petition for bankruptcy and has expressly consented to the Court's jurisdiction.

## General Allegations

8.      On April 14, 2025 ("Petition Date"), the Debtor filed a voluntary petition for bankruptcy under Chapter 7 of Title 11 of the United States Code, commencing the Bankruptcy Case. Docket No. 1.

9.      On April 14, 2025, as Docket No. 1, the Debtor filed his initial Schedules ("Initial Schedules") and Statement of Financial Affairs ("SOFA").

10.      On April 14, 2025, as Docket No. 5, Larry D. Simons was appointed as Chapter 7 Trustee.

11.      On April 28, 2025, as Docket No. 20, the Trustee filed a Notice of Assets.

12.      On June 5, 2025, as Docket No. 63, the Debtor filed Amended Schedules A/B and C and an Amended Statement of Financial Affairs ("Amended Schedules").

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

**<u>Debtor's Operation of Cornerstone Financial Services</u>**

13.     The Debtor operated Cornerstone Financial Services ("CFS") as a sole proprietorship since at least 1975, purportedly engaged in commercial truck leasing and equipment financing. CFS's public-facing website, www.trucktrailerfinance.com, advertised "A Leader in Truck and Trailer Financing Providing Solutions for the Owner Operator for Over 40 Years!"

14.     The Debtor's financing services were structured through Equipment Finance Agreements ("EFA") and Equipment Lease Agreements ("ELA"). In the event of a default, CFS had the ability to repossess the financed or leased truck from the defaulting party.

15.     In the years leading up to the Petition Date, CFS was collecting approximately $400,000 per month from truck lessees on accounts receivable, and the Debtor reported gross income from CFS operations of $11,906,799 in 2023, $9,779,145 in 2024, and $1,541,395 through the Petition Date in 2025.

16.     In connection with CFS, Debtor solicited tens of millions of dollars from investors by issuing promissory notes through CFS carrying above-market interest rates of 8% to 12% per annum. Debtor targeted a broad and diverse pool of investors over multiple decades—including individuals, self-directed IRA holders, revocable trusts, and other entities—from at least the mid-1990s through the Petition Date in 2025. The investor solicitation program began no later than 1995, when the Debtor distributed a formal written "Prospectus" to prospective investors touting yields of 14% or higher, claiming CFS had operated as a commercial lender for 20-plus years, asserting that CFS "carries sufficient reserves in the event of a liquidated loss," and boasting a "100% return, and on time, of all contracted proceeds to all Investors." Each of these representations was false. The Debtor also circulated annual newsletters through at least 1997 reinforcing the same false claims and promoting IRA investment. To solicit investors in more recent years, Debtor maintained a public website at www.trucktrailerfinance.com/investors/ advertising a "12% Fixed Rate of Return," representing that investments were "Secured by Dedicated Hard Titled Assets," that there was "No Pooling," that investors held "First Positions on All Transactions," and touting a "Proven 40+ Year Track Record Without Any Investor Loss." Each of these representations was false.

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

17. The Debtor's investor-solicitation program and its use of Participation and Security Agreements date back at least to 1995. By letter dated October 4, 1995, on CFS letterhead and signed by Dawn La Barbera (later known as Dawn Stanley) as Operations Manager, CFS solicited and documented an investor's "first Investment Transaction," reflecting a "Present Value Purchase amount" of $34,582.59 to be transferred from the investor's "Holding Account" to CFS, with returns to be paid under a "Participation and Security Agreement." As described in that letter, it was CFS's "standard procedure" to open a money market checking account "on behalf of" the investor into which CFS deposited the monthly payments—an arrangement that, like the self-directed IRA program described below, gave CFS and its personnel control over accounts holding investor funds.

18. The promissory notes issued by CFS to investors carried terms ranging from one to five years and included various interest payment arrangements (monthly, quarterly, annual, or accrued until maturity). Importantly, many notes included automatic-renewal provisions stating that the note would renew with the same terms and conditions unless CFS received written notice of intent to liquidate at least 90 days prior to maturity. These provisions structurally prevented investors from recovering their principal without Debtor's cooperation.

19. The aggregate investor claims filed in this Bankruptcy Case appear to exceed $60 million. The Debtor's disclosed CFS accounts receivable amount to only approximately $12 million. This leaves an unexplained shortfall of approximately $48 million that was never disclosed to investors prior to the Petition Date.

### The Related Businesses and Insider Relationships

20. In addition to CFS, the Debtor controlled two related entities: Stoneway Capital Corporation ("Stoneway") and Calzona Truck Sales, Inc. ("Calzona") (together, the "Related Businesses"). Both entities were incorporated in California and listed the same address as CFS—4310 Redwood Highway, San Rafael, California—as their principal business address.

21. The Debtor served as Chief Executive Officer and Chief Financial Officer of Stoneway and as Chief Executive Officer of Calzona. Dawn Stanley served as Secretary of both entities. The Debtor's son, Logan Stone, served as Chief Financial Officer of Calzona and, pursuant to a CFS employment agreement, was responsible for management oversight of sales traffic at both

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

CFS and Calzona, for which he received $16,000 per month from CFS—a total of approximately $198,929.74 reflected on his 2024 W-2 Form.

22. CFS, Stoneway, and Calzona shared the same office space, the same officers, and the same office personnel. Despite shared personnel who worked across all three entities, payroll expenditures for those employees were paid exclusively by CFS. Stoneway did not pay any rent for the shared office space.

23. Stoneway Capital Corporation independently solicited investors through its own public-facing website at www.stoneway.capital, which contained investor representations identical to those on CFS's website—advertising a "12% Fixed Rate of Return," investments "Secured by Dedicated Hard Titled Assets," "No Pooling," "First Positions on All Transactions," and a "Proven 40+ Year Track Record Without Any Investor Loss." Although California Secretary of State records show that Stoneway Capital Corporation was not formed until 2014, the company's website claims: "For over 48 years Stoneway Capital Corporation has paid a 10–13% rate of return, with today's fixed rate paying 12%. Many indicators are down on standard investments, so NOW IS THE TIME for a change." The Stoneway website also required a minimum investment of $250,000, offered the same 1-to-5-year maturity structure paying 8%–12%, and directed prospective investors to the same Westamerica Bank account. Investors who wired funds to Stoneway accounts were unaware that Stoneway was also insolvent and that the same collateral portfolios were simultaneously pledged to CFS investors. Each of these Stoneway representations was false.

24. The Debtor structured the Related Businesses to shield CFS's assets from CFS's investor-creditors. In a document titled "Proprietor Death Clause" dated May 7, 2020, prepared on CFS letterhead and signed by Dawn Stanley as Controller, the Debtor set forth a succession plan describing CFS as a sole proprietorship owned by the Debtor and held in a trust (a separate instrument from the David R. Stone Living Trust referenced elsewhere in this Complaint) of which Dawn Stanley is the Trustee. The document states that Stoneway Capital Corporation is a "separate parallel finance corporation" within the trust that was "started in December of 2014," that Stoneway was licensed to "conduct the same commerce as CFS," and that the "sole purpose" of Stoneway was "to have all assets and liabilities of CFS roll over by legal form to SCC in the event of death"

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

of the Debtor, with CFS to continue as a DBA of Stoneway. The document further provides that the trust is the beneficiary of the Debtor's life insurance policies, that those proceeds were directed to "first look to capital requirements of SCC and all Investor roll off activity of CFS," and that the Debtor's son, Logan Stone (then 25 years old), and Dawn Stanley were the designated officers of Stoneway, with Logan Stone's "primary inheritance" tied to "the ongoing performance of SCC." The same document lists among the Debtor's and CFS's proprietary "skills and management techniques" such functions as "Debtor Bankruptcy Filing Management," "Asset Recovery and Liquidation," "Pensco Trust Company Management," and "Annual 1099 Reports & Filings."

25.     Logan Stone, the Debtor's son, played an active role in soliciting investors for CFS, not merely as a payroll recipient but as a direct point of contact for new investors. Multiple investor declarations confirm that Logan Stone introduced prospective investors to the CFS program and directed them to Dawn Stanley ("Stanley") and the Debtor. Stanley, as Controller of CFS, co-signed investor solicitation materials, communicated directly with investors regarding the safety and collateralization of their investments, and created and transmitted promissory notes on the Debtor's behalf. Stanley left CFS's employment on or about March 20, 2025—approximately 25 days before the Petition Date—while investors' April interest payments remained outstanding.

26.     The Trustee's retained forensic accountant, Maria M. Yip, CPA, CFE, CFF, CIRA ("Forensic Accountant"), prepared a written forensic accounting report ("Yip Report") analyzing the financial records of the Debtor, CFS, and the Related Businesses for the four-year period immediately preceding the Petition Date (April 14, 2021 through April 14, 2025) ("4-Year Period"). The Yip Report is based on a database of over 44,000 transactions drawn from the bank records, accounting records, and promissory notes of the Debtor, CFS, and the Related Businesses.

**CFS's Inability to Generate Sufficient Cashflow — The Yip Report**

27.     The Yip Report analyzed the bank transactions (inflows and outflows) of CFS for each month during the 4-Year Period to determine whether CFS generated sufficient cashflow from its own business operations to pay the monthly returns due to investors. "Non-Investor Inflows" consisted of payments from CFS business operations (lease and financing payments, truck sale

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

proceeds, insurance). "Investor Inflows" consisted of funds received from investors. "Investor Outflows" consisted of all payments made to investors.

28. Based on the Yip Report, CFS failed to generate sufficient cashflows from Non-Investor Inflows alone to cover Non-Investor Outflows plus interest payments to investors as early as May 2021—nearly four years before the Petition Date. During the 4-Year Period, CFS failed to generate sufficient cashflows in 31 of the 48 months analyzed.

29. The cashflow deficits worsened significantly in 2023 and 2024. During 2023, CFS had an overall cashflow shortfall (Non-Investor Inflows minus Non-Investor Outflows minus investor interest paid) of approximately $2,723,177. During 2024, that shortfall exceeded $4,268,073—more than $350,000 per month on average. CFS also failed to generate sufficient cashflows in each of the three months immediately preceding the Petition Date (January, February, and March 2025).

30. In addition to the monthly cashflow analysis, the Yip Report analyzed whether CFS would have been able to repay maturing investor principal if investors had not agreed to roll over their notes. Based on that analysis, the Yip Report identified 12 months—beginning as early as May 2021—during which CFS would not have had sufficient funds, even including its $800,000 Westamerica Bank line of credit, to repay the principal due to investors whose promissory notes would have expired but for their renewal. For example:

      a)     In May 2021, CFS's average daily bank balance was approximately $732,256 with approximately $167,741 in available line of credit, against aggregate principal due but for renewal of $3,100,000—a shortfall of approximately $2,200,001;

      b)     In May 2024, CFS's average daily bank balance was approximately $759,613 with only $38,709 in available line of credit, against aggregate principal due but for renewal of $3,785,780—a shortfall of approximately $2,987,456; and

      c)     In September 2024, CFS's average daily bank balance was approximately $292,816 with no available line of credit, against aggregate principal due but for renewal of $2,447,152—a shortfall of approximately $2,154,335.

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

31. The Yip Report identified at least 45 investors who had at least one promissory note renewed at least once, and at least one investor whose promissory note exceeding $500,000 was renewed at least seven times. In some cases, original investor principal remained in CFS operations for over ten years due to multiple renewals. Some of these rollovers were not voluntary market decisions by investors—they were structurally compelled by automatic-renewal provisions embedded in the notes, and they were essential to preventing the collapse of the scheme.

**Debtor's Use of New Investor Funds to Pay Existing Investors — FIFO Tracing**

32. The Yip Report performed a detailed FIFO (First-In, First-Out) tracing analysis of CFS's Westamerica Bank accounts (accounts x5975, x9731, and x5991) to determine whether Debtor through CFS paid existing investors using funds received from new investors. FIFO tracing is a standard forensic accounting methodology that applies the rationale that funds held in an account are paid out in the order in which they are received. The Yip Report identified seven documented examples of new investor funds being used within days—and in one instance, hours—of receipt to make payments to existing investors:

a) Example 1 (May 21, 2021): CFS received $1,000,000 from a new investor. Within one week, CFS paid at least $201,960.43 to at least twelve existing investors from that deposit, including $88,901.23 on May 25, $109,309.20 on May 27, and $3,750 on May 28, 2021.

b) Example 2 (October 14, 2021): CFS received $750,000 and $250,000 from two new investors. Within the following weeks, CFS paid at least $484,640.65 to an existing investor on October 21, $500,000 to an existing investor on November 5, and $502,000 to at least two existing investors on November 8, 2021.

c) Example 3 (April 19, 2022): CFS received $500,000 from a new investor. Within the following weeks, CFS made a series of payments to existing investors totaling at least $95,000, including payments on April 29, May 5, May 6, May 9, and May 12, 2022.

d) Example 4 (March 1, 2023): CFS received $500,000 from a new investor. The following day, March 2, 2023, CFS paid $500,000 to one existing investor, of

8

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

which $334,708.46 is directly traceable to the $500,000 in new investor funds received the prior day.

e) Example 5 (May 6, 2024): CFS received $500,000 from a new investor. Within nine days, CFS paid at least $252,442.77 to numerous existing investors, including at least six investors on May 10, at least five on May 13, at least seven on May 14, and at least one on May 15, 2024.

f) Example 6 (November 5, 2024): CFS received $200,000 from a new investor. On that same day, CFS made payments to at least three existing investors totaling $32,500 (of which $27,186.75 is traceable to the new investor funds). Within the following week, CFS paid at least an additional $51,073.07 to at least eleven existing investors.

g) Example 7 (November 7, 2024): CFS received $300,000 from a new investor. Within eight days, CFS paid $325,445.24 to existing investors—nearly the entirety of the new investor deposit—including $75,424.01 on November 13, $22,000 on November 14, and $228,021.23 on November 15, 2024. The Forensic Accountant identified this pattern as a sign of "increased liquidity pressure being experienced by the scheme." Less than six months later, the Debtor filed for bankruptcy.

33. All CFS operations ceased upon the Petition Date, and the Trustee has assumed control of all estate assets, including the CFS accounts receivable, equipment lease portfolios, and QuickBooks accounting records.

**Transfers to Debtor's Personal Accounts and Related Businesses**

34. The Yip Report identified significant transfers from CFS bank accounts to the Debtor personally and to the Related Businesses during the 4-Year Period. Specifically:

a) The Debtor transferred approximately $5,000,000 from CFS's bank accounts to his personal Westamerica Bank account (x4210) during the 4-Year Period;

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

b)      The Debtor transferred $211,500 from CFS's bank accounts to Stone Motor Company LLC, a California limited liability company at the same Redwood Highway address whose sole assets are the Debtor's personal vehicles; and

c)      The Debtor made payments totaling $149,101.64 from CFS's bank accounts to Porsche Financial Services (including in connection with a 2022 Bentley Continental GT Mulliner lease) during the 4-Year Period.

35.     In addition to the foregoing, the Debtor's bank and credit card records reflect substantial additional payments made for the Debtor's personal benefit during the period leading up to the Petition Date, including:

a)      Monthly payments to Porsche/Bentley Financial totaling $83,628 during the period January 26, 2024, through February 12, 2025;

b)      Approximately $110,000 in payments to the Debtor's personal Chase credit card ending x6298 between January 2024 and March 2025, of which approximately $103,000 reflected travel-related expenses, including the following charges each exceeding $10,000: (1) $10,729 paid to the Wynn Las Vegas hotel on January 8, 2024; (2) $10,429 paid to the Everline Resort & Spa, Olympic Valley on June 24, 2024; (3) $11,603 paid to The Little Nell hotel on August 6, 2024; and (4) $15,415.51 paid to Montage on November 9, 2024; and

c)      Additional charges on the personal Chase credit card, including $5,695 paid to Proam Events on December 23, 2024, and $10,552 paid to Todds Performance LLC on January 23, 2025.

36.     In addition, the Yip Report identified significant commingled transfers between CFS and the Related Businesses. During the 4-Year Period, CFS transferred a net of approximately $3,610,241 to Calzona (transferring $3,926,241 to Calzona while receiving only $316,000 back). CFS also transferred $1,182,195 to Stoneway while receiving $1,125,165 from Stoneway—a net outflow from CFS to Stoneway of approximately $57,030. The transfers to Stoneway were recorded in CFS's books as owner draws but were recorded as income in Stoneway's books—a further accounting irregularity.

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

37.      On August 2, 2023, CFS made a $780,000 payment on a Calzona promissory note to a Calzona investor, pursuant to a guarantee CFS had issued on Calzona's behalf. CFS thus stood as guarantor for Related Business obligations while its own investor obligations went unmet.

**Debtor's False Representations Regarding Collateral**

38.      The Chapter 7 Trustee has confirmed that no security instruments were filed or annotated in DMV records by Debtor/CFS to create valid individualized security interests in trucks for any investor, and the same truck portfolios were pledged to multiple investors simultaneously. For example, the same Equipment Finance and Lease Agreement—the Rafael Diaz Velazquez lease, valued at $117,450—appears on the Schedules A's pledged to at least two separate investors, Scott Cunningham and Robert Vogl, simultaneously.

39.      The Debtor made written contractual representations to investors that he had "properly and timely filed, recorded and perfected" security interests in the trucks and that "there have been no prior assignments of the Equipment Agreements or pledges of the Equipment Agreements as collateral to another lender." Both representations were false. Westamerica Bank held a senior lien on the CFS accounts receivable, meaning investor-creditors were structurally subordinated at every level. These same false representations were repeated verbatim in each Participation and Security Agreement ("PSA") the Debtor issued in connection with investors' self-directed IRA accounts, where the Debtor explicitly warranted that "Assignor has properly and timely filed or recorded the ELA as required under all applicable filing and recording statutes" and that "no other assignment or security interest has been or will be granted with respect to the collateral or the monies assigned hereunder." These representations were made as recently as April 15, 2024 in connection with a PSA executed by the Debtor personally, and were false each time they were made.

40.      The Debtor promoted a program pursuant to which investors could use self-directed Individual Retirement Account ("IRA") funds to purchase EFAs and ELAs from CFS through Participation and Security Agreements ("PSAs"). To facilitate this program, the Debtor or Stanley served as designated representatives with "full authority to access the Account information and give" the IRA custodian "investment and transaction instructions" for the investor's account. This

11

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

arrangement gave the Debtor and Stanley unfettered discretionary control over investor retirement accounts, enabling them to direct withdrawals from those accounts to CFS without the investors' contemporaneous participation. The Debtor exploited this control to drain IRA accounts into CFS through PSAs that falsely represented the security and segregation of each investor's interest. Upon the Petition Date, Pacific Premier Trust (the successor IRA custodian) reported that the CFS-related private debt holdings in at least one investor's IRA had a market value of $0, representing a total loss of approximately $542,201.98 in IRA investments that the Debtor had warranted were secured, segregated, and fully protected.

41.    The Debtor submitted materially false financial statements to Westamerica Bank, including a balance sheet reflecting ownership of investment-grade diamonds, gold and silver, artwork, fine wine, and weaponry valued at approximately $2,620,400, most of which Debtor admitted under oath at the Section 341(a) meeting of creditors did not exist at the time the financial statement was provided or allegedly were the separate property of his wife Anna V. Stone.

42.    In addition to the above, multiple investor declarations confirm that the Debtor made additional material misrepresentations to investors to induce investments and to forestall redemptions, including: (a) representing to investors that he had personally invested $20,000,000 of his own money in CFS, suggesting alignment of interest and personal financial commitment to the scheme's success, when no such investment existed; (b) representing that he had extensive life insurance policies in place to protect investors in the event of his death; (c) in at least one instance, presenting an interest rate as a "for family only" special rate of 11%, when other investors were simultaneously receiving that same rate or higher; (d) issuing IRS Form 1099s to investors for tax years 2023 and 2024 reporting interest income that was never actually earned through any legitimate CFS business operation, causing investors to pay federal income taxes on fictitious earnings (the issuance of those 1099s was itself a fraudulent act designed to maintain the appearance that investors were receiving legitimate investment returns); (e) issuing written "Guaranty" agreements (including guaranties dated 1996, 1998, and 2006) that purported to "unconditionally guaranty against a financial setback of any kind" and promised recourse to "all business assets and personal assets now owned and hereafter acquired," but that were sham

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

guaranties in substance because the Debtor was guarantying only his own obligations to the same investors he had already defrauded—providing no additional security whatsoever; and (f) exploiting automatic-renewal provisions and roll-over tactics as a deliberate device to defer repayment indefinitely, consistent with a business model designed from inception to prevent investors from recovering principal.

43.    The Debtor's representations of financial health to investors continued even as CFS's decline began. In or about the spring of 2020, at the onset of the COVID-19 pandemic, the Debtor issued a written statement "To our Investors" on CFS letterhead, signed by David Stone, representing that "Business is steady," that "Our reserves are intact, Lines of Credit are available but not necessary," that the "mini crisis will blow over," and assuring investors of "no disruption in interest payments." These representations were materially false and are directly inconsistent with the Debtor's later February 21, 2025, admission that CFS "has been in a steady decline since Covid 2020" and that its reserves had "dwindled to serious levels," as well as with the Yip Report's finding that CFS was unable to fund investor returns from operations as early as May 2021.

44.    On or about February 21, 2025—less than two months before the Petition Date—the Debtor transmitted a written communication to at least one investor (Richard Klussman) explicitly acknowledging, for the first time, that "Cornerstone has been in a steady decline since Covid 2020," that CFS had experienced "a high number of investor account closures," that "reserves have dwindled to serious levels," and that he was "temporarily suspending capital withdrawals." Rather than disclosing these facts to all investors and potential investors, and rather than filing for bankruptcy protection at that time, the Debtor continued to receive new investor funds: investor Rob Terheyden wired $200,000 to CFS in or about December 2024, and investor Scott Cunningham's $250,000 note—signed January 2, 2025—was countersigned by the Debtor on January 14, 2025. The February 21 email's admission that CFS had been "in a steady decline since Covid 2020" is directly inconsistent with the Debtor's simultaneous representations to investors that CFS was financially healthy and its operations were secure, and demonstrates that the Debtor possessed contemporaneous knowledge of CFS's insolvency while continuing to accept new

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

investor capital and roll over existing notes without disclosure. Simultaneously, Debtor was representing to investors that "business was good."

45.     Consistent with the foregoing, on January 3, 2025—approximately three months before the Petition Date—the following investor monies were deposited into the Westamerica Bank account ending x5991 held in the name of the David R. Stone Living Trust, David R. Stone, Trustee, doing business as Cornerstone Financial Services: (a) $125,000 from Laurie Strang Cunningham; and (b) $125,000 from Scott E. Cunningham. These deposits were received at a time when, by the Debtor's own subsequent admission, CFS had been in a steady decline and its reserves had dwindled to serious levels, and the Debtor failed to disclose CFS's true financial condition or his contemporaneous knowledge of its insolvency to these investors before accepting their funds.

46.     The Debtor's son, Logan Stone, testified that the Debtor told him a few months before the Petition Date that he needed to file for bankruptcy. The Debtor also instructed Logan Stone not to tell anyone. This testimony establishes that the Debtor possessed actual knowledge of his inevitable bankruptcy months before the Petition Date, yet continued to solicit and accept new investor funds—including the deposits described above—without disclosing that impending bankruptcy to investors.

### The Palm Desert Property

47.     In the Amended Schedules filed June 5, 2025, the Debtor disclosed his ownership interest in the real property located at 49841 Canyon View Drive, Palm Desert, California 92260 ("Palm Desert Property") and listed its value as $5,000,000. The Debtor claimed a homestead exemption in the amount of $628,470.

48.     The Debtor's Schedule I discloses that he is not employed and derives his sole monthly income of $3,200 from Social Security. His Schedule J discloses approximately $41,785 in monthly expenses—approximately 13 times his monthly income—including a $6,875 monthly mortgage on the Palm Desert Property and $6,580 in monthly electricity and gas.

49.     Since the Petition Date, the Trustee has sold the two other non-homestead properties that were part of the Estate: (1) the commercial condominium at 4310 Redwood Highway, Suites 100 and 200, San Rafael, California 94903, and (2) the residential property at 170 Greenwood

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

Avenue, San Rafael, California 94901. The Palm Desert Property is now the Debtor's sole remaining real estate asset.

50.     In each of the tax years 2021, 2022, 2023, and 2024, the Debtor's home address is listed on his income tax returns as P.O. Box 3482, San Rafael, California. The Debtor's driver's license lists 4310 Redwood Highway, San Rafael, California 94903—the same address as CFS's principal place of business—as his address.

51.     In the SOFA filed on the Petition Date together with his petition and bankruptcy schedules, Question 2 asks whether the Debtor lived anywhere other than the address listed during the last three years, and the Debtor answered "No," listing his only address as the Palm Desert Property. The Debtor likewise listed the Palm Desert Property as his primary residence and as the property in which he claimed a homestead exemption. The Debtor, however, testified at a meeting of creditors that he split his time between the two residences. The Debtor's sworn statement in his SOFA that he did not live anywhere else during the relevant period cannot be reconciled with his sworn testimony that he split his time between two residences; one or the other is a false oath— either in the SOFA or at the Section 341(a) meeting of creditors.

## First Claim for Relief
## Prepetition Transfer or Concealment of Property
## with Intent to Hinder, Delay, or Defraud
## 11 U.S.C. § 727(a)(2)(A)

52.     Plaintiff realleges and incorporates herein by this reference the allegations contained in Paragraphs 1 through 51, inclusive, as though fully set forth herein.

53.     Section 727(a)(2)(A) denies a debtor's discharge if, within one year before the date of filing, the debtor has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, any property of the debtor with intent to hinder, delay, or defraud a creditor or an officer of the estate. 11 U.S.C. § 727(a)(2)(A). The definition of "transfer" under the Bankruptcy Code is broad, encompassing each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

property or an interest in property, including money belonging to the debtor. 11 U.S.C. § 101(54)(D).

54.    The relevant prepetition period for purposes of § 727(a)(2)(A) is April 14, 2024, through April 14, 2025 ("One-Year Period"). Within the One-Year Period, the Debtor transferred property belonging to him—including funds received from new investors—to pay existing investors, to transfer funds to his personal accounts, and to fund the operations of the Related Businesses. When new investor funds were deposited into CFS's bank accounts, they became the property of the Debtor and/or the Estate. He then transferred those funds—within days and sometimes hours of receipt—to repay existing investor obligations.

55.    The specific prepetition transfers include, without limitation:

a)    On November 5, 2024 (within the One-Year Period), CFS received $200,000 from a new investor and, within days, paid at least $83,573.07 of those new investor funds to existing investors (Examples 6 and 7 of the Yip Report);

b)    On November 7, 2024 (within the One-Year Period), CFS received $300,000 from a new investor and, within eight days, paid $325,445.24 to existing investors— nearly the entirety of the new investor deposit;

c)    Also within the One-Year Period, in October or November 2024, at a time when other investors were demanding the return of their principal at maturity and the Debtor knew he had no means of repaying them, the Debtor actively solicited at least one long-standing investor (who had been invested with CFS since at least 1997) to make an additional $200,000 loan, offering an increased interest rate of 12% to entice the investor to provide new funds. A promissory note for this $200,000 was executed on November 8, 2024, with the funds deducted directly from the investor's IRA account. This new loan was solicited and received while the Debtor knew CFS was insolvent, that he had no intention or means of repaying it, and while the Debtor was simultaneously routing other new investor funds to pay down prior investor obligations; and

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

d)      During the One-Year Period, the Debtor transferred funds from CFS accounts to his personal Westamerica Bank account (x4210), and made payments from CFS accounts to Porsche Financial Services in connection with a 2022 Bentley Continental GT Mulliner lease, totaling a portion of the approximately $5,000,000 and $149,101.64, respectively, transferred during the full 4-Year Period; and

e)      During the One-Year Period, the Debtor continued to transfer funds from CFS to Calzona (including $508,960 in 2024 net transfers to Calzona) and made concealed transfers to the Related Businesses inconsistent with arm's-length dealings.

56.    The Debtor acted with the intent to hinder, delay, or defraud creditors in making the foregoing transfers. Fraudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct. The following indicia of fraudulent intent - the "badges of fraud" - are present here:

a)      Insider Relationships. The Debtor's transfers benefited insiders, including his son Logan Stone (who received $16,000 per month in payroll exclusively funded by CFS while also performing work for Calzona), Stone Motor Company LLC (which held only the Debtor's personal vehicles), and the Related Businesses (Stoneway and Calzona), each of which the Debtor controlled as Chief Executive Officer. Transfers to insiders are a recognized badge of fraud.

b)      Retention of Personal Benefit. The Debtor retained direct personal benefit from the transfers at the expense of creditors. Approximately $5,000,000 in CFS funds were transferred to the Debtor's personal bank account during the 4-Year Period. CFS funds were also used to make at least $149,101.64 in lease payments on a 2022 Bentley Continental GT Mulliner and at least $211,500 in transfers to Stone Motor Company LLC, an entity holding only the Debtor's personal vehicles. Moreover, Debtor additionally used investor funds to finance extravagant expenditures for his son Logan Stone, including: a Marin Country Club membership, a Mercedes-Benz AMG G63 vehicle, and a BMW M-Series SUV. The Debtor

17

COMPLAINT TO DENY DISCHARGE

hosted Logan's wedding at the Empire Polo Club in Indio, California, which the Debtor represented on multiple occasions cost approximately $1,000,000—an event attended by many of the very investors whose funds were used to finance it without their knowledge. During this same period, the Debtor transmitted text messages to at least one investor displaying photographs of newly purchased vehicles and "upgraded jewelry" as evidence that CFS was thriving, even as CFS's reserves had, by the Debtor's own later admission, "dwindled to serious levels." The Debtor also paid approximately $6,000 for a ski trip for his son Logan Stone and Logan's wife, Laura Stone, in late 2024 or early 2025. In 2024, the Debtor purchased a "30-year" ring for his daughter, Pia Klausen, and purchased a bracelet inscribed with the name "Ksenia" for his wife, Anna. These personal enrichment transfers occurred while investor-creditors went unpaid.

c)      Lack or Inadequacy of Consideration. The payments made to existing investors within the One-Year Period were not made in exchange for new value— they were made from new investor funds to service obligations that CFS could no longer fund from legitimate operations. The transfers to the Related Businesses and to the Debtor personally similarly lacked adequate arm's-length consideration: no interest was charged on the "loans" from CFS to Calzona, accounting treatment was inconsistent across entities, and Stoneway received rent-free office space funded by CFS.

d)      Financial Condition Before and After Each Transaction. The Debtor was deeply insolvent throughout the One-Year Period and was aware of his insolvency. CFS's cashflow deficits worsened progressively: the 2024 annual shortfall exceeded $4.2 million (over $350,000 per month). As each new investor deposit was received and then routed to existing investors, the net position of CFS's creditors eroded further. The Debtor's aggregate investor obligations exceeded $60 million while available accounts receivable totaled only approximately $12 million. The Debtor knew throughout this period that he lacked any lawful means of repaying investors—

18

COMPLAINT TO DENY DISCHARGE

a conclusion confirmed by the Yip Report's finding that CFS failed to generate sufficient cashflows in 31 of the 48 months of the 4-Year Period.

e)    Pattern of Transactions After Incurring Debt and Onset of Financial Difficulties. As confirmed by the Yip Report, CFS's inability to pay investors from legitimate operations was documented as early as May 2021. Rather than ceasing operations or disclosing his insolvency to investors, the Debtor continued to solicit new investor funds, roll over maturing notes through automatic-renewal provisions, and use new investor deposits to make payments to existing investors—a pattern that persisted for nearly four years until the Petition Date. The Debtor continued this course of conduct even as the liquidity pressure intensified: by November 2024, nearly the entirety of a $300,000 new investor deposit was exhausted within eight days to pay existing investors. This escalating pattern—continuing to incur new investor obligations while knowing they could not be serviced from legitimate operations, and buying time through rollovers and "Ponzi" payments—is a hallmark of fraudulent intent.

f)    General Chronology of Events and Transactions. The chronology of the Debtor's scheme reflects a deliberate course of fraud: CFS and Stoneway Capital Corporation operated publicly for decades—beginning no later than the mid-1990s when the Debtor distributed a formal Prospectus falsely claiming 14%+ yields, sufficient reserves, and a 100% on-time repayment record to all investors; issuing sham Guaranty agreements purporting to unconditionally protect investors while providing no additional security; and inducing investors to place retirement savings into CFS through self-directed IRA programs over which the Debtor maintained unauthorized discretionary control—while soliciting investors through websites advertising false track records and non-existent security interests; forensic cashflow analysis confirms CFS was unable to fund investor returns from operations as early as May 2021 yet continued soliciting investors; the Debtor simultaneously diverted millions to personal accounts and Related Businesses; pledged identical truck

COMPLAINT TO DENY DISCHARGE

collateral to multiple investors; embedded automatic-renewal provisions to trap investor principal; and made false financial statements to his bank. As recently as January 14, 2025—just 89 days before the Petition Date—the Debtor countersigned a $250,000 promissory note for a new investor. On February 21, 2025, the Debtor issued a written communication to at least one investor acknowledging CFS "has been in a steady decline since Covid 2020" and unilaterally "temporarily suspending capital withdrawals"—yet still did not disclose this to the broader investor pool or file for bankruptcy protection until April 14, 2025. During the weeks between that February 21, 2025, communication and the Petition Date, the Debtor continued to hold and manage investor funds without disclosing the true state of CFS's affairs. The scheme continued until the Petition Date—April 14, 2025—when, with $60 million in investor claims against $12 million in assets, the Debtor filed for bankruptcy and CFS operations ceased.

g)　　Concealment and Secrecy. The Debtor actively concealed the true nature and extent of CFS's insolvency from investors. He did not disclose to new investors how much he owed to prior investors. He publicly represented on CFS's website that investments were "Secured by Dedicated Hard Titled Assets," that there was "No Pooling," that investors held "First Positions on All Transactions," and that CFS had a "Proven 40+ Year Track Record Without Any Investor Loss"—each representation false. He pledged the same truck collateral to multiple investors simultaneously without disclosure. He submitted a materially false balance sheet to Westamerica Bank reflecting assets that did not exist. He embedded automatic-renewal provisions into investor notes to prevent redemptions. And he routed CFS funds to personal accounts, Related Businesses, and personal vehicles through accounting entries designed to obscure the true nature of those transactions.

57.　　The Debtor's receipt of new investor funds in the months immediately preceding the Petition Date—including the $125,000 deposits from each of Laurie Strang Cunningham and Scott E. Cunningham on January 3, 2025—without disclosure of his impending bankruptcy further

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

confirms his fraudulent intent. As the testimony of the Debtor's son, Logan Stone, establishes, the Debtor knew months before the Petition Date that he needed to file for bankruptcy and directed that this fact be concealed. The Debtor's continued solicitation and acceptance of investor funds during this period, while knowingly withholding the fact of his impending bankruptcy, confirms that the Debtor acted with the intent to hinder, delay, and defraud his creditors.

58.    Taken together, these badges of fraud establish that the Debtor transferred property belonging to him within one year of the Petition Date with the intent to hinder, delay, and defraud his creditors—including his investor-creditors who are owed in excess of $60 million.

59.    Accordingly, Debtor is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

## Second Claim for Relief

## Concealment, Destruction, or Failure to Keep Recorded Information

## 11 U.S.C. § 727(a)(3)

60.    Plaintiff realleges and incorporates herein by this reference the allegations contained in Paragraphs 1 through 51, inclusive, as though fully set forth herein.

61.    Section 727(a)(3) of the Bankruptcy Code provides that a debtor shall not receive a discharge if the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure was justified under all of the circumstances of the case. 11 U.S.C. § 727(a)(3).

62.    Courts assess the adequacy of a debtor's financial records under § 727(a)(3) by considering the following factors: (1) whether the debtor was engaged in business and, if so, the complexity and volume of that business; (2) the amount of the debtor's obligations; (3) whether the failure to keep records was the debtor's fault; (4) the debtor's education, business experience, and sophistication; (5) the customary business practices for record-keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part; and (8) the debtor's courtroom demeanor. Each of these factors weighs against the Debtor here.

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

63.     Complexity and Volume of the Business. The Debtor operated CFS as a sole proprietorship for approximately forty years, maintaining Equipment Finance Agreements and Equipment Lease Agreements with commercial truck lessees, soliciting investment from more than sixty investors through promissory notes, and operating simultaneously through three related corporate entities—Stoneway, Calzona, and CFS—that shared officers, employees, office space, and bank accounts. During the 4-Year Period alone, CFS processed over 44,000 transactions across multiple Westamerica Bank accounts, generating over $9 million in gross income annually and collecting approximately $400,000 per month in accounts receivable.

64.     Amount of Debtor's Obligations. Aggregate investor claims filed in this Bankruptcy Case exceed $60 million—against disclosed CFS accounts receivable of only approximately $12 million, leaving an approximately $48 million gap.

65.     Fault for the Record-Keeping Failure. The Debtor was the sole principal of CFS. Stone operated CFS as a sole proprietorship under his personal name, served as Chief Executive Officer and Chief Financial Officer of Stoneway, Chief Executive Officer of Calzona, and sole architect of the investor solicitation program. He personally received and disbursed investor funds—commingled through CFS's Westamerica Bank accounts. The Yip Report identifies specific accounting irregularities in the books that do exist—including transfers recorded as owner draws in CFS's books but as income in Stoneway's books, and purported loans to Calzona recorded without any interest charge—establishing that the Debtor's own hand was responsible for the records that were maintained, including the inaccuracies in them. The fault for the failure to maintain records from which the $48 million shortfall can be explained rests squarely and exclusively on the Debtor.

66.     Debtor's Education, Business Experience, and Sophistication. The Debtor is not an unsophisticated individual with no financial experience. He operated CFS for approximately forty years, held himself out on a public website as operating "A Leader in Truck and Trailer Financing Providing Solutions for the Owner Operator for Over 40 Years!" and served as CEO and CFO of multiple corporate entities. He structured investor solicitations through formal promissory notes with specific interest rates (8%–12%), defined collateral terms, and automatic-renewal provisions requiring 90 days' written notice to cancel. He maintained relationships with Westamerica Bank

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

sufficient to obtain an $800,000 line of credit and to submit financial statements in connection with that banking relationship.

67.    Customary Business Practices for Record-Keeping. CFS's business—commercial truck financing and equipment leasing combined with investor solicitation through secured promissory notes—is quintessentially an activity for which records are kept. Lenders and financing companies routinely maintain: individual loan files for each borrower, collateral documentation including UCC filings and DMV security interest notations, investor ledgers tracking principal, interest payments, and maturity dates, general ledgers reconciling inflows and outflows, and bank statements reconciled to internal records. CFS's own solicitation of investors through formal promissory notes—which promised specific interest rates, named specific collateral, and identified specific term lengths—created a contractual framework that demanded correspondingly detailed records. Yet the Trustee found no perfected security interest filings created by Debtor/CFS in DMV records for any investor, discovered that the same collateral portfolios were pledged to multiple investors simultaneously, and identified a $48 million gap between aggregate investor claims and available assets that the available records cannot explain.

68.    Degree of Accuracy in Existing Records. The records that do exist are not merely incomplete—they are internally inconsistent and affirmatively false. The Yip Report documents that the same transfers between CFS and Stoneway were recorded as "owner draws" in CFS's books but as "income" in Stoneway's books. Transfers to Calzona were recorded as loans in some instances with no corresponding interest accrual. The Debtor submitted a balance sheet to Westamerica Bank reflecting approximately $2,620,400 in assets—diamonds, gold, silver, artwork, fine wine, and weaponry—that he later admitted under oath largely did not exist at the time the statement was provided. Stone's records are internally contradictory to the degree that their existence provides no meaningful assurance of accuracy. A forensic accountant had to build an independent database of over 44,000 transactions to attempt to reconstruct what Stone's records should have made ascertainable.

69.    Egregious Conduct. Here, the Yip Report confirms that the Debtor: (a) transferred approximately $5,000,000 from CFS bank accounts to his personal account during the 4-Year

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005

Period; (b) paid $149,101.64 in Porsche Financial Services lease payments for a 2022 Bentley Continental GT Mulliner from CFS accounts; (c) pledged the same truck collateral portfolios to multiple investors simultaneously and warranted in writing that no prior assignments existed; (d) maintained a public website with materially false representations about security interests, pooling, and investor track record; (e) submitted false financial statements to Westamerica Bank; (f) issued sham Guaranty agreements beginning as early as 1996 that falsely represented to investors they had recourse against all of his "business assets and personal assets now owned and hereafter acquired" when in reality no meaningful additional security existed; (g) maintained discretionary control over investor IRA accounts at PENSCO/Pacific Premier Trust through designated representative status, enabling him and Stanley to direct investor retirement savings into CFS without contemporaneous investor participation; and (h) in October or November 2024, while investors were demanding return of their principal at maturity and he knew CFS was insolvent, solicited and received an additional $200,000 loan from a long-standing investor at an increased 12% interest rate—a targeted act of fraud against an existing victim. This constellation of conduct—active diversion of investor funds, intentional misrepresentation of collateral rights, and systematic false disclosures across investor agreements, banking relationships, and public solicitations—represents egregious conduct that weighs heavily in favor of denial of discharge.

70.     The Trustee's Forensic Reconstruction Establishes the Inadequacy of the Debtor's Records. The most concrete evidence of the inadequacy of the Debtor's records is the forensic exercise the Trustee was compelled to undertake. The Trustee retained a forensic accounting firm to build, from raw bank records and QuickBooks files, a database of over 44,000 transactions spanning the 4-Year Period. This exercise—the very "reconstructing" that courts and creditors should not be required to perform, took a team of forensic accountants months to complete and yet still cannot account for the approximately $48 million gap between investor claims and available assets. The 44,000-transaction forensic reconstruction is the functional equivalent of the bankruptcy judge being handed a tow sack—it is what happens when a debtor who received tens of millions of dollars from investors over decades keeps records insufficient to account for where those funds went. That the forensic exercise required to partially reconstruct CFS's affairs consumed over

24

COMPLAINT TO DENY DISCHARGE

44,000 transactions and still left $48 million unexplained is, by itself, dispositive evidence that the Debtor's records are not merely imperfect but fundamentally inadequate.

71. The Debtor Cannot Justify His Failure to Maintain Records. Having demonstrated the inadequacy of the Debtor's records, the burden shifts to the Debtor to justify that failure. No justification exists. Unlike debtors who have invoked lack of sophistication or reliance on a spouse or co-principal, Stone is a seasoned businessman who operated CFS for forty years as its sole proprietor and served as CEO and CFO of his related entities. He had no co-principal upon whom any record-keeping duty could have been delegated or shared. Stone was not a subordinate participant—he was the sole operator, sole proprietor, and sole architect of the CFS investment scheme. The duty to maintain records from which CFS's financial condition could be ascertained rested exclusively on him, and he failed to meet it.

72. Accordingly, Debtor is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(3).

### Third Claim for Relief

### False Oath or Account

### 11 U.S.C. § 727(a)(4)(A)

73. Plaintiff realleges and incorporates herein by this reference the allegations contained in Paragraphs 1 through 51, inclusive, as though fully set forth herein.

74. Section 727(a)(4)(A) of the Bankruptcy Code provides that a debtor shall not receive a discharge if the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account.

75. The Debtor made false oaths in connection with his Bankruptcy Case, including in his Initial Schedules, Amended Schedules, Statement of Financial Affairs, and sworn testimony at the Section 341(a) meeting of creditors. Specifically:

    a) The Debtor submitted materially false financial statements to Westamerica Bank—including a balance sheet reflecting ownership of diamonds, gold and silver, artwork, fine wine, and weaponry valued at approximately $2,620,400—and admitted under oath at the Section 341(a) meeting that most of those items did not exist at the time the financial statement was provided;

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

b)      The Debtor's public website advertised a "12% Fixed Rate of Return," investments "Secured by Dedicated Hard Titled Assets," "No Pooling," investors' "First Positions on All Transactions," and a "Proven 40+ Year Track Record Without Any Investor Loss"—each representation false and made in connection with the fraudulent scheme giving rise to the debts now asserted in this Bankruptcy Case; and

c)      The Debtor's Schedules and/or SOFA fail to fully and accurately disclose the nature, extent, and history of CFS operations, investor solicitations, the known approximately $48 million shortfall between investor claims and available assets, and the transfers of approximately $5 million to his personal account and $3.6 million net to Calzona during the 4-Year Period. Additionally: (a) the Debtor issued IRS Form 1099s to investors for tax years 2023 and 2024 representing interest income as legitimately earned when the Debtor knew it was derived from Ponzi payments and not from CFS business profits, causing investor-creditors to pay income taxes on fictitious earnings; (b) the Debtor failed to disclose in his Schedules or SOFA the existence of Stoneway Capital Corporation's separate investor-solicitation program or the additional investor obligations incurred through Stoneway; (c) on February 21, 2025, the Debtor transmitted written communications to at least one investor admitting CFS had been "in a steady decline since Covid 2020" and was suspending capital withdrawals, while simultaneously failing to make equivalent disclosures to all investors, to new investors solicited after that date, or to this Court in his subsequently filed Schedules and SOFA; and (d) the Debtor failed to disclose in his Schedules or SOFA personal expenditures funded from CFS accounts, including gifts to Logan Stone (Marin Country Club membership, Mercedes AMG G63 and BMW M-Series vehicles) and the approximately $1,000,000 cost of Logan Stone's wedding at the Empire Polo Club in Indio, California.

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

d)      The Debtor misrepresented under oath his status as an alleged peace officer in order to falsely claim a "tools of the trade" exemption in valuable guns, ammunition and firearms and also knowingly, willfully and falsely misrepresented the value and number of said guns, ammunition and firearms.

e)      The Debtor knowingly and intentionally failed to disclose the full extent of the firearms, ammunition, and tactical weapons in his possession, and filed an amended Schedule B disclosing the same only on April 21, 2026—after the Trustee retained an expert in tactical weapons, whose application to be employed was filed on April 1, 2026, to inventory and evaluate the extent of those assets. In reliance on the Debtor's false oaths, the Trustee initially sought to abandon certain firearms, ammunition, and safes; the assets ultimately proved to be worth substantially more than the Debtor had scheduled.

f)      Investors have informed the Trustee, that the Debtor misrepresented under oath the primary location of his alleged actual and intended principal residence in order to falsely claim a homestead exemption in real property to which he was not entitled.

g)      The Debtor misrepresented under oath the nature and amount of payments and asset transfers made to individuals by the Debtor in the pre-petition period, including falsely understating under oath the amount of payments that the Debtor made to Ron Foreman.

h)      The Debtor scheduled investors as secured lenders in his bankruptcy schedules when they were in fact unsecured investors, thereby mischaracterizing the nature of their claims to avoid the heightened scrutiny that the Debtor's investor-solicitation scheme would otherwise have invited.

76.    The Debtor's false oaths and accounts were knowingly and fraudulently made and are material because they relate directly to the nature and extent of the Estate's assets and liabilities, the Debtor's fraudulent scheme, and the interests of the more than sixty investors and other creditors with claims exceeding $60 million in the Bankruptcy Case.

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

77.     Accordingly, Debtor is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(4)(A).

## Fourth Claim for Relief

## Failure to Explain Loss of Assets

## 11 U.S.C. § 727(a)(5)

78.     Plaintiff realleges and incorporates herein by this reference the allegations contained in Paragraphs 1 through 51, inclusive, as though fully set forth herein.

79.     Section 727(a)(5) of the Bankruptcy Code provides that a debtor shall not receive a discharge if the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. 11 U.S.C. § 727(a)(5).

80.     The aggregate investor claims filed in this Bankruptcy Case exceed $60 million. The Debtor's disclosed CFS accounts receivable total only approximately $12 million. This approximately $48 million shortfall represents assets that the Debtor received from investors—assets that once belonged to the Debtor and are no longer available to creditors. The Debtor accepted investor funds, issued promissory notes promising repayment, and cannot account for where the money went. The shortfall is further compounded by the Debtor's exploitation of investor IRA accounts: by serving as designated representative with full transaction authority over investor self-directed IRA accounts at PENSCO/Pacific Premier Trust, the Debtor directed IRA withdrawals into CFS through PSAs that he warranted were secured and ring-fenced. Those IRA-funded investments are now worth zero—at least one investor's IRA of approximately $550,986 on the Petition Date (of which $542,201.98 was in CFS PSAs) was reduced to approximately $8,351 in cash by June 30, 2025, a total loss that the Debtor's records cannot explain. The disappearance of approximately $48 million in investor funds, including retirement savings the Debtor controlled and directed, is precisely the type of substantial asset deficiency that shifts the burden to the Debtor under § 727(a)(5).

81.     CFS's own revenues cannot explain the shortfall. Here CFS generated substantial revenues throughout the period in question—$11,906,799 in gross income in 2023 and $9,779,145

COMPLAINT TO DENY DISCHARGE

4858-0401-2858V.2-1574-005

in 2024—and collected approximately $400,000 per month from truck lessees on accounts receivable. CFS was, on its face, a revenue-generating operation. Yet despite those revenues, investor claims exceed available assets by approximately $48 million. The existence of business income makes the shortfall more inexplicable, not less: if CFS was generating $400,000 per month in collections, the missing $48 million cannot be attributed to mere business losses without a documented, line-by-line accounting of where those revenues went.

82.     The partial explanations available from the Yip Report do not come close to satisfying the Debtor's burden and themselves require documentary support that the Debtor has not provided:

a)     During the 4-Year Period alone, approximately $5,000,000 was transferred from CFS to the Debtor's personal account, $3,610,241 net was transferred to Calzona, $211,500 was transferred to Stone Motor Company LLC, and $149,101.64 was paid to Porsche Financial Services for a 2022 Bentley Continental GT Mulliner lease. Even aggregated, these identified transfers total less than $9.2 million—a fraction of the approximately $48 million shortfall and covering only the 4-Year Period, not the full history of investor losses.

b)     The Yip Report's FIFO tracing documents that CFS used new investor deposits to make Ponzi payments to existing investors throughout the 4-Year Period. These payments account for a portion of the outflow, but by definition represent only transfers between investor-creditors—they do not explain where the principal invested by those creditors ultimately went or why the total creditor claims exceed available assets by $48 million. Moreover, investor communications filed in this Bankruptcy Case confirm that the same specific truck leases listed as collateral on individual investor Schedule A's were pledged to multiple investors simultaneously—for example, the Rafael Diaz Velazquez lease ($117,450) appears on the Schedule A of both investor Robert Vogl (note dated November 4, 2024) and investor Scott Cunningham (note dated January 2, 2025)—confirming that the truck lease portfolios could not have been segregated, individualized collateral as

29

COMPLAINT TO DENY DISCHARGE

represented, and that the aggregate present value of the purported collateral on those two notes alone ($218,694 and $254,950, respectively) was drawn from the same pool of encumbered assets, further obscuring any accounting of where investor principal actually went.

c)     The Debtor submitted a false balance sheet to Westamerica Bank reflecting approximately $2,620,400 in assets—diamonds, gold, silver, artwork, fine wine, weaponry—that largely did not exist. Any attempt by the Debtor to explain asset losses by reference to those falsely represented assets would itself be "vague, indefinite, and uncorroborated," and would be directly contradicted by the Debtor's own sworn admissions.

d)     The Debtor could not and did not explain satisfactorily the answers to questions posed to him at his Section 341(a) Meetings by representatives of the Office of the United States Trustee regarding the loss, disposition and location of substantial sums of money in principal investments received by the Debtor from defrauded investors in the prepetition period.

83.     The Debtor has failed to explain satisfactorily, and cannot explain satisfactorily, the approximately $48 million deficiency between the assets received from investors and the assets now available to creditors. That failure materially prejudices the Trustee's administration of the Estate and the interests of creditors holding claims in excess of $60 million.

84.     Accordingly, Debtor is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(5).

**Prayer**

WHEREFORE, Plaintiff prays that this Court enter judgment denying Debtor's discharge and awarding costs of suit to the Plaintiff.

MOREOVER, Plaintiff further prays that, to the extent the Debtor is determined to have improperly claimed a homestead exemption in the Palm Desert Property and the Trustee proves the same in this adversary proceeding, this Court enter an order disallowing and denying the Debtor's claimed homestead exemption in the Palm Desert Property in its entirety, as authorized under Federal Rule of Bankruptcy Procedure 4003(b)(2), which permits the Trustee to object to a

4858-0401-2858V.2-1574-005

fraudulently claimed exemption within one year after the closing of the case; provided, however, that to the extent the Court declines to adjudicate the Debtor's homestead exemption in this adversary proceeding, the Trustee reserves the right to file a separate objection to the homestead exemption based upon the findings the Court may enter herein.

DATED: June 1, 2026                              MARSHACK HAYS WOOD LLP

                                                    /s/      Laila Rais
                                                 LAILA RAIS
                                                 SARAH R. HASSELBERGER
                                                 ATTORNEYS FOR CHAPTER 7 TRUSTEE,
                                                 LARRY D. SIMONS

COMPLAINT TO DENY DISCHARGE
4858-0401-2858V.2-1574-005